**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BARKHA SHAH, Derivatively on Behalf of Nominal Defendant ASCENA RETAIL GROUP, INC., | |
| Plaintiff, | |
| v. | Civ. Act. No.  20-cv-831-LPS |
| DAVID R. JAFFE, ROBERT GIAMMATTEO, KATIE J. BAYNE, KATE BUGGELN, KAY KRILL, CARL RUBIN, LINDA YACCARINO, ELLIOTT JAFFE, RANDY L. PEARCE, STEVEN L. KIRSHENBAUM, STACEY RAUCH, CARRIE W. TEFFNER, and JOHN L. WELBORN, JR. | |
| Defendants, | |
| and | |
| ASCENA RETAIL GROUP, INC., | |
| Nominal Defendant | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Barkha Shah ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Ascena Retail Group, Inc. ("Ascena" or the "Company"), against Defendants David R. Jaffe, Robert Giammatteo, Katie J. Bayne, Kate Buggeln, Kay Krill, Carl Rubin, Linda Yaccarino, Elliott Jaffe, Randy L. Pearce, and Steven L. Kirshenbaum ( collectively "Defendants"), who are certain current and former members of its Board of Directors (the "Board") and executive officers, seeking to remedy Defendants' breaches of fiduciary duties, unjust enrichment, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon,

1

among other things, the investigation conducted by and through Plaintiff's attorneys, which included the review and analysis of: (a) documents and information obtained pursuant to 8 Del. C. § 220 ("Section 220") (the "220 Demand"); (b) public filings made by Ascena and other related parties and non-parties with the United States ("U.S." Securities and Exchange Commission ("SEC"); (c) press releases and other publications disseminated by certain of the Defendants (defined herein) and other related non-parties; and (d) other publicly available information concerning Ascena and Defendants.

## I.      NATURE AND SUMMARY OF ACTION

1.      This action involves a long-running scheme by Defendants to artificially inflate Ascena's assets by concealing negative business trends, and in so doing, increase incentive compensation paid to certain of Ascena's management.

2.      Ascena is a holding company that earns income through subsidiaries that sell women's clothing under various retail brand names.  During the time period at issue in this action, Ascena claimed to be "a leading national specialty retailer of apparel for women and tween girls." As of 2017, the Company sold clothing through approximately 4,800 stores in the United States, Canada and Puerto Rico.  These operations produced approximately $6.6 billion in revenue for Ascena during its 2017 fiscal year.

3.      Ascena's predecessor entity was the Dress Barn Inc. ("Dress Barn"), a discount fashion company that operated a line of stores by the same name.  Dress Barn's founders are the parents of Defendant David R. Jaffe ("Jaffe").

4.      Ascena is the successor to Dress Barn.  After beginning his career in private equity, defendant Jaffe took over the Company in 2002.  Over the approximately next thirteen years, Jaffe led Ascena on an acquisition spree.  The brands Ascena acquired include relatively well-known discount fashion brands such as Lane Bryant, Catherine's, Maurices, and Justice.

2

5.      In 2015, the acquisition spree culminated with the acquisition of ANN, Inc., ("ANN").  Ascena's acquisition of ANN represented a change in operating strategy.  While the Company had previously focused on discount fashion, ANN was a premium brand that targeted a different consumer group.

6.      Ascena acquired ANN for approximately $2 billion.  Following the ANN acquisition, the Company claimed that the value of ANN's goodwill and intangible assets was well over $1 billion and repeatedly assured investors that it was regularly reviewing the value of those assets.

7.      However, known to Defendants and concealed from the public, Ascena had significantly overpaid for ANN's business, which was already suffering when Ascena acquired it. Consumers were frequenting ANN's stores less and less, and as a result, ANN was heavily discounting its merchandise in an attempt to lure consumers back to its stores.  The reduced store traffic and discounts materially affected ANN's, and Ascena's gross margins.  ANN's comparable store sales were falling significantly.  As set forth herein, several members of Ascena's management and Board had previously worked at ANN and were well aware of the negative trends. Further, the Board and management regularly reviewed ANN's results and the value of the intangible assets.  Indeed, the negative business trends required Defendants to review and correct the book valuation of ANN's intangible assets.

8.      Concealing the truth, the Board and management continued to represent that the Company's goodwill and other intangible assets were valued at over $1.28 billion and $1.27 billion, respectively, and that its goodwill and trade names were not impaired.  The Board and management knew otherwise.

9.     On May 17, 2017, approximately two years after the ANN transaction, Ascena announced that based on declining store sales and the significant decrease in the price of its common stock, it would conduct an impairment analysis and expected to announce a material impairment charge to its goodwill and other intangible assets.

10.    Three weeks later, on June 8, 2017, Ascena shocked investors by disclosing an impairment charge at $1.324 billion.  The charge represented a material reduction to Ascena's balance sheet and effectively conceded that most of the assets acquired in the ANN acquisition were worthless.

11.    The repeated misrepresentations regarding Ascena's core business personally benefited Ascena's management.   At relevant times, the Company employed incentive compensation metrics that evaluated Ascena's results, including its share price, which was artificially inflated by defendants' misrepresentations.   Indeed, Defendant Jaffe earned $4.6 million in 2016 and $6.6 million in 2017, due in part to his misrepresentations of Ascena's business.

12.    Following disclosure of the write down in 2017, Ascena's stock price languished and Jaffe was forced out in May 2019.  Jaffe had been awarded millions of dollars' worth of then-unvested incentive compensation during his wrongdoing in 2016 and 2017, in large part due to Ascena's artificially inflated stock price and inflated results.  At the time of his termination in May 2019, a significant portion of this compensation was unvested due to the Company's employment of a three year vesting period for many equity awards.  The Board, rather than vindicate the Company's interests and hold Jaffe accountable for what he had done, actually helped Jaffe see to conclusion his scheme to enrich himself by falsifying Ascena's results.  The Board allowed Jaffe

to maintain pretextual employment at Ascena as an advisor, and agreed not to terminate him, until he had achieved complete vesting of his equity awards.

13.      Due to information obtained in response to the Section 220 Demand, Plaintiff did not make a litigation demand on the Board prior to filing this action.  Plaintiff has not made a demand on Ascena's Board because doing so would have been a futile and useless act.  Eight of Ascena's eleven current directors could not disinterestedly and independently consider a demand for action due to their conflicted loyalties and/or participation in the wrongdoing alleged herein.  As a result, demand is excused.

## II.      JURISDICTION AND VENUE

14.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 10(b) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.      THE PARTIES

**Plaintiff**

16.      Plaintiff Barkha Shah has continuously owned Ascena stock at times relevant to the allegations herein.

**Nominal Defendant**

17.     Nominal Defendant Ascena is a corporation incorporated under the laws of Delaware with its principal executive offices located at 933 MacArthur Boulevard, Mahwah, New Jersey 07430.   The Company's stock trades on the NASDAQ exchange under the symbol "ASNA."

**Defendants**

18.     Defendant Jaffe served as Chief Executive Officer ("CEO"), President and Chairman of the Board of Ascena since 2002. He retired from his position as CEO and Chairman of the Board on May 1, 2019. He remained a member of the Board of Directors until February 2020. Jaffe is the son of Ascena co-founders Elliot and Roslyn Jaffe.

19.     Defendant Robert Giammatteo ("Giammatteo") served as Chief Financial Officer ("CFO") and Executive Vice President ("EVP") of Ascena from February 11, 2015, through July 25, 2019. Giammatteo joined Ascena in September 2013 as its Senior Vice President of Financial Planning and Analysis and Investor Relations.

20.     Defendant Katie J. Bayne ("Bayne") has served as a director of the Company since June 2015.  Bayne previously served on the board of directors of ANN INC. until its acquisition by the Company in August 2015.  Bayne is a member of the Leadership and Corporate Governance Committee.

21.     Defendant Kate Buggeln ("Buggeln") has served as a director of the Company since 2004.  Buggeln is a member of the Compensation and Stock Option Committee and the Leadership and Corporate Governance Committee.

22.     Defendant Kay Krill ("Krill") is a director of Ascena and served as Chief Executive Officer of ANN until October 31, 2015, and as President of ANN from 2004 through October 31, 2015.  Krill served as a member of the Board of Directors of ANN from 2004 until acquired by

the Company.  From 2001 to 2004, Krill served as President of ANN's LOFT Division.  From 1998 to 2001, Krill was Executive Vice President, Merchandise and Design of ANN's LOFT Division.  From 1996 to 1998, Krill served as Senior Vice President, General Merchandise Manager of ANN's LOFT Division and, from 1994 to 1996, she was Vice President of Merchandising for Ann Taylor. Krill has served as a director of the Company since July 2015. According to Krill's director independence questionnaire signed in August 2018, in the previous 12 months, she received more than $120,000 in compensation from Ascena   Krill previously served as a member of the board of directors of the National Retail Federation.

23.      Defendant Carl Rubin ("Rubin") has served as a director of the Company since 2015.  Rubin is the Chair of the Audit Committee and a member of the Compensation and Stock Incentive Committee.  Rubin previously served as a member of the board of directors of the National Retail Federation.

24.      Defendant Linda Yaccarino ("Yaccarino") has served as a director of the Company since 2016.  Yaccarino is the Chair of the Compensation and Stock Incentive Committee and a member of the Leadership and Corporate Governance Committee.

25.      Defendant Elliot Jaffe co-founded the Company and serves as Chairman Emeritus. He served as Non-Executive Chairman from January 2013 to December 2016 and as CEO of the Company from 1962 to 2002.

26.      Defendant Randy L. Pearce ("Pearce") served as a director of the Company from 2005 to October 2018. During his tenure, he was the Chair of the Audit Committee.

27.      Defendant Steven L. Kirshenbaum ("Kirshenbaum") served as a director of the Company from 2015 to June 2019.

28. Defendant Stacey Rauch ("Rauch") has served as a director of the Company since June 2017. Rauch is a member of the Audit Committee and is Chair of the Leadership and Corporate Governance Committee.

29. Defendant Carrie W. Teffner ("Teffner") has served as Executive Chair of Ascena since 2018. Teffner is a member of the Operations and Strategy Committee.

30. Defendant John L. Welborn, Jr. ("Welborn") has served as a director of the Company since 2018. Welborn is a member of the Audit Committee and the Leadership and Corporate Governance Committee

31. The defendants named in ¶¶ 18-30 are sometimes referred to herein as the "Individual Defendants."

**Relevant Non-Parties**

32. Non-party Gary Muto ("Muto") currently serves as director of Ascena and its Chief Executive Officer. Muto served as the President and Chief Executive Officer of Ascena brands from August 2017 to May 2019. Muto previously was an executive of ANN, serving as President of ANN Inc. brands when Ascena acquired ANN. Before that, Muto served in various executive roles at ANN since 2008 when we was President of LOFT.

33. Non-party Gary Begeman ("Begeman") has served as director of Ascena since 2019.

34. Non-party Paul Keglevic ("Keglevic") has served as a director of Ascena since 2019.

## IV. DUTIES OF THE INDIVIDUAL DEFENDANTS

35. By reason of their positions as officers, directors, and/or fiduciaries of Ascena and because of their ability to control the business and corporate affairs of Ascena, at all relevant times, the Individual Defendants owed Ascena and its shareholders fiduciary obligations of good faith,

541213.3

loyalty, and candor, and were required to use their utmost ability to control and manage Ascena in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Ascena and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Ascena and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

36. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ascena, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Ascena, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

37. To discharge their duties, the officers and directors of Ascena were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Ascena were required to, among other things:

    (a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    (b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    (c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

38.     Ascena is a leading national specialty retailer of apparel for women and tween girls. The Company sells its products exclusively at its own brick-and-mortar stores or online platforms and focuses on niche markets, such as fashion for pre-adolescent girls or plus-size women.  Ascena uses a 52-53 week fiscal year ending on the last Saturday in July.  As of the year ended July 29, 2017, Ascena had 4,800 stores in the United States, Canada, and Puerto Rico.

39.     Ascena's predecessor company, Dress Barn, was founded in 1962 in Stamford, Connecticut, by Roslyn and Elliot Jaffe – the parents of Defendant Jaffe – and was intended to provide wear-to-work clothing for the working woman during a time when more women were entering the workforce.

40.     Defendant Jaffe spent over a decade in the private equity field before joining the family business.  During his time in private equity, Jaffe described himself as an investor who would "spend[] time trying to acquire businesses that would work" noting that he "would sit on boards, so it was all very strategic."

41.     In 1992, Jaffe joined the Company as a Vice President and ultimately replaced his father as President and CEO in 2002.  Under his control, The Dress Barn, Inc. reorganized in 2011 to become Ascena Retail Group, Inc., which would serve as the parent-holding company for its retail operating brands.

42.     Determined to grow his parents' business into an empire, Jaffe essentially turned the Company into his own private equity firm, setting out on an acquisition spree.  In 2005, the Company acquired Maurices, which offers women's casual clothing, career wear, dressy apparel,

active wear and accessories targeted at core and plus-sized women, for $320 million.  In November 2009, the Company acquired Tween Brands, Inc., which operates under the store name Justice and offers apparel, accessories, and lifestyle products for girls ages six to twelve, for $256 million.  In 2012, Ascena acquired the parent company of Lane Bryant and Catherine's for a deal valued at $849 million; these brands offer wear-to-work apparel, sportswear, intimate apparel, accessories, select footwear and social occasion apparel at a moderate price point to female customers in plus-sizes.

       **B.**       **The ANN Acquisition**

43.    Whereas Ascena's prior acquisitions concerned brands that offered moderately-priced clothing, the acquisition of the ANN brands would help the Company break into the premium fashion business.  ANN, the parent company of the brands Ann Taylor and LOFT, offers premium clothing targeted toward affluent women 25-50 years old.  Ann Taylor is aimed at clothing for the modern, stylish American woman, while LOFT offers a younger, casual clothing and accessory line.  As of January 31, 2015, ANN operated 1,030 stores under the trade names Ann Taylor, Ann Taylor Factory, and LOFT Outlet.

44.    On May 18, 2015, Ascena announced that it had entered into a definitive merger agreement to acquire ANN (the "ANN Acquisition").  ANN stockholders would receive $37.34 in cash and 0.68 shares of Ascena common stock in exchange for each share of ANN common stock.  Upon closing, ANN's former stockholders would own approximately 16% of Ascena.  Ascena financed the acquisition, in part, "through a $1.8 billion senior secured term loan it placed on July 29, 2015," representing an unprecedented level of debt for the Company.

45.    Analysts doubted whether the ANN Acquisition was the right move for the Company.  For example, analyst Steven Marotta of CL King wrote "[w]e are a bit surprised at the timing and scope of this acquisition. As ANN will increase ASNA's revenue base by more than

11

50%, any hiccups similar to the last transaction will undoubtedly act as a multiple contractor to ASNA's valuation."

46.     Upon acquiring ANN, the Company became the largest US-based specialty apparel retailer focused exclusively on the female consumer.  In connection with the ANN acquisition, the Company recorded $959.6 million of goodwill, of which $733.9 million was assigned to Ascena's ANN reporting unit and the remaining $225.7 million balance of goodwill was allocated to Ascena's other reporting units based upon anticipated procurement, fulfillment, distribution and shared services cost savings in those reporting units resulting from the acquisition.

### C.     Applicable Accounting Standard

47.     According to Generally Accepted Accounting Principles ("GAAP"), codified in Accounting Standards Codification ("ASC") Topic No. 350, *Intangibles - Goodwill and Other*, goodwill is an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized.  Intangible assets are non-financial assets lacking physical substance other than goodwill.

48.     Goodwill must be tested annually for any impairments.  It must also be tested on an interim basis when events and circumstances indicate that the carrying amount of goodwill, *i.e.*, the amount reflected in the financial statements, is impaired.  ASC Topic No. 350 provides examples of events and circumstances that may indicate goodwill is impaired, including:

a)     Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

b)     Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in

market-dependent multiples or metrics, a change in the market for an entity's products or services, or a regulatory or political development;

c)      Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

d)      Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

e)      Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

f)      Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

g)      A sustained decrease in share price (consider in both absolute terms and relative to peers).

49.      Goodwill is impaired if the carrying amount (*i.e.*, the amount reported on a company's balance sheet) of a reporting unit exceeds its fair value.  This difference is the amount of the goodwill impairment, *i.e.*, the goodwill impairment charge = carrying amount – fair value.

50.      With respect to intangible assets other than goodwill, the accounting for impairment depends on the asset's useful life.  An intangible asset with a finite useful life is to be amortized, and intangible assets with infinite useful lives, such as the Ann Taylor and LOFT trade names at issue in this case, are to be tested for impairment annually and more frequently if events or changes

13

in circumstances indicate that it is more likely than not that the asset is impaired.

51.     Pursuant to ASC Topic No. 350, a qualitative assessment may be performed to determine whether it is necessary to perform the quantitative impairment test for infinite life intangible assets.  A company may bypass the qualitative assessment for any indefinite life intangible asset and proceed directly to performing the quantitative impairment test.  When electing to perform a qualitative assessment, qualitative factors should be assessed to determine whether it is more likely than not (*i.e.*, a likelihood of more than 50%) that an indefinite life intangible asset is impaired.

52.     If after assessing the totality of events and circumstances and their potential effect on the significant inputs used to determine the fair value of indefinite life intangible assets, an entity determines that:

- It is not more likely than not that the indefinite life intangible asset is impaired, then the entity need not calculate the fair value of the intangible asset and perform the quantitative impairment test; or

- It is more likely than not that the indefinite life intangible asset is impaired, then the entity should calculate the fair value of the intangible asset and perform the quantitative impairment test.

53.     All relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite life intangible asset should be reviewed including:

a)     Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on future expected earnings and cash flows that could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

b)     Financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods that could affect significant inputs used to determine the fair value of the indefinite

life intangible asset;

    c)    Legal, regulatory, contractual, political, business, or other factors, including asset-specific factors that could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

    d)    Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation that could affect significant inputs used to determine the fair value of the indefinite life intangible asset;

    e)    Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected changes in distribution channels) that could affect significant inputs used to determine the fair value of the indefinite life intangible asset; and

    f)    Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets that could affect significant inputs used to determine the fair value of the indefinite life intangible asset.

    54.    An entity also should consider the following to determine whether it is more likely than not that the indefinite life intangible asset is impaired:

    a)    Positive and mitigating events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite life intangible asset;

541213.3

b)       If an entity has made a recent fair value calculation for an indefinite life intangible asset, the difference between that fair value and the then carrying amount; and

c)       Whether there have been any changes to the carrying amount of the indefinite life intangible asset.

55.     The quantitative impairment test for an indefinite life intangible asset consists of a comparison of the fair value of the asset with its carrying amount.  If the carrying amount of an intangible asset exceeds its fair value, an impairment loss should be recognized in an amount equal to that excess.

56.     At all relevant times, Ascena was required to follow the guidance of ASC Topic No. 350 in accounting for its goodwill, including the goodwill recorded in connection with the ANN Acquisition, and its indefinite life intangible assets, including its Ann Taylor and LOFT trade names.

### D.    The Individual Defendants Fail to Recognize an Impairment to Goodwill and Intangible Assets Despite Declining ANN's Sales

57.     Even prior to Ascena's acquisition of it, ANN suffered declining sales and store traffic, declining comparable sales, a shift in consumer spending, and a drastically altered competitive environment. These trends, as well as a steady decline in the Company's stock price and market capitalization, deteriorated ANN's goodwill and intangible assets.

58.     For example, a KeyBanc analyst report published on May 7, 2017 reflects that, by December 2015, ANN brands experienced declining comparable store sales growth, which continued to deteriorate, particularly in the Ann Taylor division:

### Exhibit 1: Comps by banner

| Comp | 2Q15 | 3Q15 | 4Q15 | 1Q16 | 2Q16 | 3Q16 | 4Q16 | 1Q17 | 2Q17 |
|---|---|---|---|---|---|---|---|---|---|
| Consolidated | 1% | -1% | -2% | -3% | -5% | -4% | -5% | -5% | -4% |
| Justice | -6% | -12% | -17% | -15% | -17% | -11% | -4% | -1% | -1% |
| Lane Bryant | 1% | 4% | 3% | 4% | 2% | -1% | 1% | -4% | -5% |
| maurices | 8% | 6% | 8% | 7% | 0% | -6% | -9% | -6% | -8% |
| dressbarn | 2% | -4% | -3% | -5% | -4% | -2% | -7% | -5% | -3% |
| Catherines | 9% | 4% | 3% | -1% | -3% | -8% | -5% | -10% | 0% |
| Ann Taylor | 0% | -3% | -2% | -4% | -7% | -5% | -12% | -11% | -9% |
| LOFT | 2% | -1% | -2% | -1% | 1% | 2% | -2% | -3% | -2% |

Source: Company reports, transcripts and KeyBanc Capital Markets Inc.
NOTE: Consolidated comp includes Ann Taylor and LOFT as of 3Q16.

59.     As consumers opted for online shopping, the Company experienced a decline in traditional brick-and-mortar store traffic, which resulted in a decline in comparable sales.  To combat that trend, Ascena resorted to heavily discounting its products, which reduced the Company's margins and profitability.

60.     Between 2016 and early 2017, Ascena's stock price decreased significantly due to its declining sales, another important indicator of potential impairment:



541213.3

61.     In June 2017, Ascena announced a $1.3 billion reduction to its goodwill and intangible assets, purportedly due to the uncertainty of future comparable sales given the dynamic change in the Company's retail sector. However, as defendant Giammatteo later admitted, the change in the projections underlying the Company's ANN valuation had been evident to the Individual Defendants for *years*, stating that it was "a significant change in the market environment we've seen over the past couple of years."

### E.      The Individual Defendants Caused the Company to Issue Materially False and Misleading Statements

62.     On December 1, 2015, the Individual Defendants caused Ascena to file its quarterly report on Form 10-Q with the SEC for the quarter ended October 24, 2015 (the "1Q16 10-Q").  The report was signed by Defendants Jaffe and Giammatteo.  Therein, the Company reported net loss of $0.10 per share and goodwill of $1.273 billion.

63.     As to the ANN Acquisition, the 1Q16 10-Q attributed $953.2 million of the purchase price to goodwill and $815 million to trade names. Regarding the valuation of these assets, the report stated, in relevant part:

> The Company accounted for the ANN Acquisition under the acquisition method of accounting for business combinations. Accordingly, the cost to acquire such assets was allocated to the underlying net assets in proportion to estimates of their respective fair values. The excess of the purchase price over the estimated fair value of the net assets acquired was recorded as goodwill, which consists largely of the synergies and economies of scales expected from integrating ANN's operations. Goodwill is non-deductible for income tax purposes. Given the close proximity of the closing date of the acquisition to the end of the Company's current fiscal quarter, the allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, is based upon preliminary information and is subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained.  The Company expects to finalize the allocation of the purchase price to the assets acquired and liabilities assumed by the spring of 2016, particularly as it relates to the valuation of ANN's numerous leases.

* * *

18

> The values assigned to the Ann Taylor and LOFT trade names were derived using the relief-from-royalties method under the income approach. . . . The Ann Taylor and LOFT trade names are deemed to have indefinite lives and are not amortized but subject to an impairment assessment annually, or more frequently if events or changes in circumstances indicate that the asset may be impaired.

64.     The above statements in ¶¶ 62-63 were materially misleading because they failed to disclose: (i) that declining performance by the ANN brands and other indicators signaled that the Company must perform an impairment test; and (ii) that the Company was reasonably likely to recognize an impairment charge to accurately reflect the value of ANN's goodwill and intangible assets.

65.     With respect to the financial statements contained therein, the 1Q16 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations. However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

66.     The above statements in ¶ 65 were materially misleading because they failed to disclose that the 10-Q overstated Ascena's assets and understated its expenses, thereby overstating its income.

67.     The same day, the Company held a conference call to discuss the financial results with analysts and investors. During the call, Defendant Jaffe acknowledged ANN's declining revenues, stating:

> ***Ann Taylor brand comp sales were down 4% with Ann Taylor down 1% inclusive of full-price stores and Ann Taylor.com and Ann Taylor's factory stores were***

***down 8%***. Average selling price was up 9% to last year as we successfully pulled back from all store entire purchase promotions, reduced the offer depth on category level promotions and aggressively managed down inventory.

68.     On February 26, 2016, the Audit Committee, including defendants Buggeln, Rubin, and Pearce, met via telephone.  Defendants Jaffe and Giammatteo also attended the meeting. During the meeting, the attendees were given an update with respect to purchase accounting treatment related to the ANN acquisition and possible intangible asset impairment.

69.     On March 1, 2016, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended January 23, 2016 (the "2Q16 10-Q").  The report was signed by defendants Jaffe and Giammatteo.  Therein, Ascena reported net loss of $0.12 per diluted share, goodwill of $1.268 billion, and intangible assets of $1.283 billion.

70.     Regarding the allocation of purchase price for the ANN acquisition and any impairment, the 2Q16 10-Q stated, in relevant part:

> The Company accounted for the ANN Acquisition under the acquisition method of accounting for business combinations. Accordingly, the cost to acquire such assets was allocated to the underlying net assets in proportion to estimates of their respective fair values. The excess of the purchase price over the estimated fair value of the net assets acquired was recorded as goodwill, which consists largely of the synergies and economies of scale expected from integrating ANN's operations. Goodwill is non-deductible for income tax purposes.
>
> The allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, is subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained. During the second quarter of Fiscal 2016, the Company recorded measurement-period adjustments which were not material to the condensed consolidated financial statements, as more fully described in the table below. The Company is currently in the process of finalizing the allocation of the purchase price to the assets acquired and liabilities assumed and does not expect any changes to be material.

71.     The above statements in ¶¶ 69-70 were materially misleading because they failed to disclose: (i) that declining performance by the ANN brands and other indicators signaled that

the Company must perform an impairment test; and (ii) that the Company was reasonably likely to recognize an impairment charge to accurately reflect the value of ANN's goodwill and intangible assets..

72.     The same day, the Company held a conference call with analysts and investors to discuss its second quarter 2016 fiscal results. During the call, Defendant Jaffe stated, in relevant part:

> We were not immune to the macro specialty retail environment, which was adversely impacted by soft traffic and the late onset of seasonal weather, and we would've certainly liked to have seen stronger selling during the holiday period. Excluding Justice, where negative double-digit comps were planned, Ascena comp performance was down 1% for the quarter.

73.     With respect to the financial statements contained therein, the 2Q16 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) income and cash flows of the Company for the interim periods presented. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations. However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

74.     The above statements in ¶ 73 were materially misleading because they failed to disclose that the 10-Q overstated Ascena's assets and understated its expenses, thereby overstating its income.

75.     On May 31, 2016, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended April 23, 2016 ("3Q16 10-Q"),

reporting earnings of $0.08 per diluted share, compared to earnings of $0.15 per diluted share in the prior year period. The report was signed by Defendants Jaffe and Giammatteo.

76.     The 3Q16 10-Q reported goodwill of $1.268 billion and intangible assets of $1.275 billion. The report also included reduction in the goodwill attributable to ANN: as of April 23, 2016, the goodwill related to ANN was $948.2 million, a $0.1 million decrease from the prior quarter and $5 million decrease from the acquisition date.

77.     The above statements in ¶¶ 75-76 were materially misleading because they failed to disclose: (i) that declining performance by the ANN brands and other indicators signaled that the Company was required to perform an impairment test; and (ii) that the Company was reasonably likely to recognize an impairment charge to accurately reflect the value of ANN's goodwill and intangible assets.

78.     The same day, the Individual Defendants caused Ascena to issue a press release announcing its third quarter 2016 financial results.  Therein, Defendant Jaffe recognized that the Company continued to struggle with its declining store traffic and sales:

> *. . . [T]he environment this Spring has been challenging. After the disruption of a warm holiday season, we've had to contend with an unseasonably cold spring and resulting elevated traffic headwinds.* While I think we have managed the business well, particularly with respect to inventory levels, *we were not able to fully mitigate these challenges.* Our earnings exceeded the upper end of our guidance range for the third quarter, but I'll note that performance benefited from some favorable expense timing that offset softer than expected top-line performance. These expenses will come back in the fourth quarter, and combined with the traffic challenges we've seen continue through May, we've adjusted our earnings outlook downward.

79.     Also on May 31, 2016, the Company held a conference call to discuss the results with analysts and investors.  During the conference call, defendant Jaffe confirmed that the Company's declining revenue was expected to continue further, requiring Ascena to revise its

projected earnings, stating "[b]ased on the soft traffic we've seen continue through May, we've adjusted our earnings outlook downward."

80.     Likewise, during the call Defendant Giammatteo explained that traffic in the brick-and-mortar stores continued to struggle, which adversely affected the Company's overall revenue, stating as follows:

> Net sales of $1.67 billion for the third quarter were down 4% to last year, in line with comp sales. Excluding the planned decline at Justice, Ascena comp sales were down 2%. Selling trends turned negative due to unseasonably cool weather that emerged mid-quarter, with total Company comp performance up 2% for the first eight weeks of the quarter and down 10% for the last five weeks of the quarter. The change in comp trends was caused primarily by store traffic, which slowed significantly mid-quarter. For the quarter, store traffic was down 9%.
>
> *       *       *
>
> So if you think about how March and April shook out, April turned out to be very, very challenging from a traffic standpoint.
>
> And instead of applying markdowns into low traffic periods, which is generally not productive, some of the brands held markdowns for Memorial Day and loaded up more heavily.  So brands like Justice, Lane Bryant, specifically, did not execute some planned markdowns in the end of the third quarter to hold for Memorial Day.

81.     Moreover, the declining sales trend was expected to continue.   Specifically, Defendant Giammatteo stated:

> As I said, May was generally in line with how April was. The same malaise we saw in April generally existed into May, and Memorial Day, matching this year last year, was the first period where we've seen things snap back to where we expected them to be, which was generally flat year on year during the Memorial Day period on a shifted basis.  So again, we had a challenging month of May that was generally in line with April. *We expect June and July to generally be in the line of negative low single digits that would blend us out to that negative 2 to negative 3 for the full quarter*.

82.     With respect to the financial statements contained therein, the 3Q16 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared

23

pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive (loss) and cash flows of the Company for the interim periods presented. In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the U.S. ("US GAAP") have been condensed or omitted from this report as is permitted by the SEC's rules and regulations. However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

83.     The above statements in ¶ 82 were materially misleading because they failed to disclose that the 10-Q overstated Ascena's assets and understated its expenses, thereby overstating its income.

84.     On September 16, 2016, the Audit Committee, including Defendants Buggeln, Rubin, and Pearce, met via telephone.  Defendants Jaffe and Giammatteo also attended the meeting.  During the meeting, the attendees were given an update on the allocation of goodwill from ANN and a review of the annual goodwill and intangible asset impairment analysis.  The attendees also reviewed the Company's 2016 Form 10-K to be filed three days later, and in particular  the MD&A section discussing the impact of the ANN acquisition and annual goodwill impairment testing.  At the conclusion of the meeting, the committee authorized issuance of the 2016 Form 10-K.  During the meeting, the Audit Committee was given management's operating report for the fourth quarter 2016, which included a discussion of the results of the 2016 full year impairment test.  The committee reviewed the following two slides:

541213.3

## Goodwill and Intangible Asset Impairment Testing (1/2)



- The Company engaged PwC to perform its annual goodwill and intangible asset impairment analysis for Fiscal 2016 ("FY16 Valuation").

- Similar to prior years, goodwill and intangible assets were tested on a stand-alone basis by brand and included a full-scale reconciliation of the "sum of the parts" to ascena's market capitalization.

- The methodology of determining the fair values of goodwill and other indefinite-lived intangible assets was consistent with prior years.

- Except for [ Redacted ] ANN, the fair value of each reporting unit significantly exceeds its carrying value.

4

5/213

Confidential Information

ASCNA0917

541213.3



### Goodwill and Intangible Asset Impairment Testing (2/2)

- A summary of the valuation by brand at is presented below:

| (millions) | ANN |
|---|---|
| Fair Value (KPMG Report FY15): | NA |
| Fair Value (PwC Report FY16): | 1,700 |
| Adjusted Carrying Value (4/24/16): | 1,513 |
| Percent FV in excess of CV: | 12% |

Redacted

5

6/213

Confidential Information                                                                 ASCNA0918

85.     Also during the meeting, Deloitte, the Company's independent auditor, gave the members of the Audit Committee a presentation which included a review of critical accounting policies with respect to goodwill impairments. Specifically, these defendants reviewed the following slide:

541213.3



ASCNA1081

**F.      The Truth Begins to Emerge While the Individual Defendants Continue to Issue Misleading Financial Statements**

86.      On September 19, 2016, the Individual Defendants caused Ascena to file its annual report on Form 10-K with the SEC for the period ended July 30, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Elliot Jaffe, Jaffe, Bayne, Buggeln, Kirshenbaum, Krill, Pearce, Rubin, and Giammatteo.  Therein, the Company reported $0.06 loss per diluted share for fiscal 2016.

87.      For the Company, the 2016 10-K reported goodwill of $1.279 billion and intangible assets of $1.268 billion.  For amounts attributable to ANN, the 2016 10-K reported goodwill of $733.9 million, which was a reduction of $225.7 million from the 3Q16 10-Q.  According to the 2016 10-K, this amount had been reassigned to other reporting units following "an analysis of the

27

expected synergies."

88.     In Ascena's press release published on September 19, 2016, Defendant Jaffe

confirmed the Company's declining performance:

> Fiscal 2016 was a challenging year for Ascena characterized by a highly competitive
> selling environment and significant store traffic headwinds. While we are seeing
> good customer demand during peak periods, off-peak demand has been
> inconsistent, and fourth quarter financial performance fell well below our
> expectations.

89.     The same day, Ascena held a conference call to discuss the fiscal 2016 financial

results.  During the call, Defendant Jaffe again noted that "FY16 was a challenging year" and that

"May was a particularly difficult month, with comp sales and store traffic down double digits.

Store traffic improved modestly over the June/July period, but remained down high-single digits."

He also commented on the then-current fiscal quarter:

> [O]ur customer remains inconsistent. She's out shopping during periods of need,
> but is increasingly difficult to convert during non-peak periods without a significant
> pricing message. Price has become an increasingly important dimension on the
> value equation, and our brands are evaluating opening price point strategies to
> mitigate traffic headwinds while maintaining pricing integrity with our customer .
> . . .
>
> Our fall assortment is checking in most areas, and we do not believe we have any
> major fashion gaps.  That said, our comp performance remains negative and we are
> managing the Business on a conservative footing from an inventory standpoint until
> we see signs of conviction from our customer.

90.     Regarding Ann Taylor, defendant Jaffe stated:

> Ann Taylor comp sales were down 12%, with declines in both the full price and
> factory channels caused primarily by store traffic which was down high-single
> digits. As with LOFT, we did not repeat significant promotional activity early in
> the year-ago quarter, but this benefit was more than offset by soft product
> acceptance in the full-price channel, particularly in key item categories such as
> knits, pants, and suiting.

91.     In response to the lack of store traffic, defendant Jaffe stated that the Company

would relocate or even close stores:

The second part of your question about the store base, we're really slowing down our new store openings. . . . [W]e are likely to have negative store growth at all of our other brands and overall of course, we expect to have negative store growth in FY17. So we've really raised the hurdle rate on the new store pro formas.

We're really not pushing to open new stores, we're pushing to optimize our existing fleet. So we'll continue to close stores. We'll relocate certain stores to more appropriate centers, and we're going to continue to do that on an ongoing basis.

92.     When asked to explain the shortfall from management's expectations for the year,

defendant Jaffe replied:

It's tough out there. There's no question that the female apparel shopper has pulled back. We've all seen the reports, and can't really put our finger on what it is that's brought her back from where she was in terms of her spending.

93.     On this news, Ascena's stock price fell $2.43, or nearly 30%, to close at $5.69 per

share on September 20, 2016, on unusually heavy volume.

94.     Nonetheless, the 2016 10-K reported that ANN's goodwill was not impaired

because ANN's fair value **exceeded** its carrying value, stating in relevant part:

During the fourth quarter of Fiscal 2016, the Company performed its annual impairment assessment (the "Fiscal 2016 Valuation"). While the fair values of Justice, maurices and Catherines were all significantly in excess of their respective book values, the fair value of the Company's Lane Bryant and ANN reporting units exceeded theirbook value by less than 20% . . . .

* * *

For the newly acquired ANN business, the Fiscal 2016 Valuation indicated that its fair value exceeded its carrying value by approximately 12%.

Significant assumptions underlying the discounted cash flows included: a [weighted average cost of capital] rate of 11.5% which was determined from relevant market comparisons and adjusted for specific risks; operating income margin of mid-to-high single digits and a terminal growth rate of 2%. Material changes in these assumptions could have a significant impact on the valuation model. . . .

Additionally, if we experience sustained periods of unexpected changes in consumer spending or are unable to realize the significant amount of synergies expected from the acquisition, it could adversely impact the long-term assumptions used in our Fiscal 2016 Valuation. Such trends may have a negative impact on some of the other key assumptions used in the Fiscal 2016 Valuation, including anticipated gross

margin and operating income margin as well as the WACC rate. These assumptions are highly judgmental and subject to change. Such changes, if material, may require us to incur impairment charges for goodwill and/or other indefinite-lived intangible assets in future periods.

95.     Regarding the purchase price allocation and goodwill valuation for the ANN

Acquisition, the 2016 10-K stated, in relevant part:

> The Company accounted for the ANN Acquisition under the acquisition method of accounting for business combinations. Accordingly, the cost to acquire such assets was allocated to the underlying net assets in proportion to estimates of their respective fair values. The excess of the purchase price over the estimated fair value of the net assets acquired was recorded as goodwill, which consists largely of the synergies and economies of scale expected from integrating ANN's operations. The Company allocated $225.7 million of the goodwill related to the ANN Acquisition to the Company's other reporting units where the anticipated benefits of the acquisition are expected to be achieved[.]

> The allocation of the purchase price to the assets acquired and liabilities assumed, including the amount allocated to goodwill, was subject to change within the measurement period (up to one year from the acquisition date) as additional information that existed at the date of the acquisition related to the values of assets acquired and liabilities assumed is obtained. During Fiscal 2016, the Company recorded certain measurement-period adjustments. While no material adjustments are expected, the purchase price allocation is not yet final as the Company is completing its analysis of the opening balances related to deferred taxes. The allocation will be finalized during the first quarter of Fiscal 2017.

96.     The 2016 10-K stated that, based on the results of the annual impairment test,

Ascena would not recognize any impairment to its goodwill and intangible assets.  Specifically,

the 2016 10-K stated, in relevant part:

> As discussed in Note 3, the Company performs its annual impairment assessment of goodwill and indefinite-lived intangible assets during the fourth quarter of each fiscal year. The impairment test for other indefinite-lived intangible assets consists of a comparison of the fair value of the intangible asset with its carrying value. If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized equal to the excess. ***Based on the results of the Company's annual impairment testing of goodwill and indefinite-lived intangible assets for Fiscal 2016, no impairment charges were deemed necessary.***

541213.3

97. Under the heading "Impairment to the carrying value of our goodwill or other intangible assets could result in significant non-cash charges" the 2016 10-K outlined circumstances under which Ascena's goodwill could be impaired as follows:

As described in Note 6 to the accompanying consolidated financial statements included elsewhere herein, as of July 30, 2016, we had approximately $2.5 billion of goodwill and other intangible assets related to the acquisitions of maurices in January 2005, Tween Brands in November 2009, Lane Bryant and Catherines in June 2012 and ANN in August 2015. *Current and future economic conditions, as well as the other risks noted in this Item 1A, may adversely impact our brands' ability to attract new customers, retain existing customers, maintain sales volumes and maintain margins.* As discussed in our Critical Accounting Policies included elsewhere herein, *these events could materially reduce our brands' profitability and cash flow which could, in turn, lead to a further impairment of our goodwill and other intangible assets*, in addition to the impairment losses of $306.4 million recorded during Fiscal 2015 to write down the carrying value of Lane Bryant's goodwill and intangible asset to their fair values. *Furthermore, significant negative industry or general economic trends, disruptions to our business and unexpected significant changes or planned changes in our use of the assets may result in additional impairments to our goodwill, intangible assets and other long-lived assets. Any impairment could have a material effect on our operational results and financial condition.*

98. Finally, the 2016 10-K purported to warn that "declining store traffic" could impact the Company's profitability, while neglecting to disclose that Ascena was *already* facing adverse changes to its "business, operational results, financial position and cash flows" that caused the Company to overvalue its goodwill and other intangible assets.  The report stated:

. . . . Maintaining, promoting and growing our brands will depend largely on the success of our design, merchandising and marketing efforts and our ability to provide a consistent, high-quality customer experience. In addition, while most of our brands are mature and we have extensive customer lists, our success depends, in part, on our ability to keep existing customers while engaging and attracting new customers to shop our brands. Our business and results of operations could be adversely affected if we fail to achieve these objectives for any of our brands and failure to achieve consistent, positive performance at several of our brands simultaneously could have an adverse effect on our sales and profitability. In addition, *our ability to address the challenges of declining store traffic, including at strip shopping centers, shopping malls, outlet centers and other retail centers, in a highly promotional, low growth environment may impact our ability to*

31

*maintain and gain market share and also impact our business, operational results, financial position and cash flows.*

99.     The 2016 10-K represented that the reported financial statements were prepared in

compliance with GAAP. Specifically, as to goodwill and intangible assets, the 2016 10-K stated:

***Goodwill and Other Intangible Assets, Net***
At acquisition, the Company estimates and records the fair value of purchased intangible assets, which primarily consist of certain trade names, customer relationships, favorable leases, proprietary software and franchise rights. The fair value of these intangible assets is estimated based on management's assessment, considering independent third-party appraisals, when necessary. The excess of the purchase consideration over the fair value of net assets acquired is recorded as goodwill.

Goodwill and certain other intangible assets deemed to have indefinite useful lives, including trade names and certain franchise rights, are not amortized. Rather, goodwill and such indefinite-lived intangible assets are assessed for impairment at least annually based on comparisons of their respective fair values to their carrying values.

Goodwill impairment is determined using a two-step process. The first step of the goodwill impairment test is to identify potential impairment by comparing the fair value of a reporting unit with its net book value (or carrying amount), including goodwill. If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is considered not to be impaired and performance of the second step of the impairment test is unnecessary. If the carrying amount of a reporting unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of that goodwill. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination. That is, the fair value of the reporting unit is allocated to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination and the fair value was the purchase price paid to acquire the reporting unit.

The impairment test for other indefinite-lived intangible assets consists of a comparison of the fair value of the intangible asset with its carrying value. The fair value of indefinite-lived intangible assets is primarily determined using the relief-from-royalty approach. If the carrying value of the indefinite-lived intangible asset exceeds its fair value, an impairment loss is recognized equal to the excess. In addition, in evaluating finite-lived intangible assets for recoverability, we use our

best estimate of future cash flows expected to result from the use of the asset and eventual disposition. To the extent that estimated future undiscounted net cash flows attributable to the asset are less than the carrying amount, an impairment loss is recognized equal to the difference between the carrying value of such asset and its fair value.

The Company performs its annual impairment assessment of goodwill and indefinite-lived intangible assets using a quantitative approach on the first day of its fourth quarter of each fiscal year.

Finite-lived intangible assets are amortized over their respective estimated useful lives and, along with other long-lived assets (as discussed above), are evaluated for impairment periodically whenever events or changes in circumstances indicate that their related carrying amounts may not be recoverable. Refer to the Company's accounting policy for long-lived asset impairment as described earlier under the caption "*Property and Equipment, Net*."

100.    The above statements in ¶¶ 94-99 were materially misleading because they failed to disclose: (i) that declining performance by the ANN brands and other indicators signaled that the Company must perform an impairment test; and (ii) that the Company was reasonably likely to recognize an impairment charge to accurately reflect the value of ANN's goodwill and intangible assets.

101.    On September 22, 2016, the full Board, including defendants Elliot Jaffe, Jaffe, Bayne, Buggeln, Kirshenbaum, Krill, Pearce, and Rubin met in New York, New York. The Board was given a summary of the September 16, 2016 Audit Committee meeting at which the Audit Committee reviewed and approved the Company's 2016 Form 10-K disclosures.

102.    On November 30, 2016, the Audit Committee, including Defendants Buggeln and Rubin, and Pearce, met via telephone. Defendants Jaffe and Giammatteo also attended the meeting. According to the meeting minutes, the attendees reviewed information that "highlighted the… quarterly goodwill impairment." In particular, the attendees were told that ANN exceeded its book value by less than 20% and that, as a result, an impairment was possible. The attendees specifically reviewed disclosures in the Form 10-Q regarding ANN's goodwill and the potential

33

for an impairment.  At conclusion of the meeting, the committee approved the first quarter 2017 Form 10-Q and then related earnings press release.

103.    On December 1, 2016, the Individual Defendants caused the Company to file its quarterly report on Form 10-Q with the SEC for the period quarter ended October 29, 2016 ("1Q17 10-Q"), reporting net income of $0.07 per diluted share.  The report was signed by Defendants Jaffe and Giammatteo.

104.    The 1Q17 10-Q reported that the Company's goodwill was valued at $1.279 billion and the net value of its other intangible assets was valued at $1.263 billion.  Regarding goodwill attributed to the ANN Acquisition, the 1Q17 10-Q stated "[t]here were no measurement-period adjustments recorded during the first quarter of Fiscal 2017 and the allocation of the purchase price is final."  In particular, the final allocation of the purchase price attributed $959.6 million to goodwill and $815 million to intangible assets.

105.    The above statements in ¶¶ 103-104 were materially misleading because they failed to disclose: (i) that declining performance by the ANN brands and other indicators signaled that the Company must perform an impairment test; and (ii) that the Company was reasonably likely to recognize an impairment charge to accurately reflect the value of ANN's goodwill and intangible assets.

106.    With respect to the financial statements contained therein, the 1Q17 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive income (loss) and cash flows of the Company for the interim periods presented. In addition, certain information and footnote disclosures normally included in financial statements prepared in

34

accordance with the accounting principles generally accepted in the United States of America ("US GAAP") have been condensed or omitted from this report as permitted by the SEC's rules and regulations. However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

107.    The above statements in ¶ 106 were materially misleading because they failed to disclose that the 10-Q overstated Ascena's assets and understated its expenses, thereby overstating its income.

108.    Also on November 30, 2016, Ascena held a conference call to discuss the financial results with analysts and investors. During the call, Defendant Jaffe stated:

> ***Our performance in the first quarter was again challenged by ongoing store traffic headwinds and increasing customer price sensitivity that our industry has been contending with for multiple seasons.*** While we believe the extraordinary election cycle and warmer weather contributed to lackluster consumer activity, ***ultimately, we were disappointed with our sales performance.***
>
> ***Total Ascena comp sales were down 5% below our run rate in mid September when we issued our FY17 and first quarter guidance.*** Although sales and margin results did not come in as we had hoped, I am pleased that our efforts delivered first-quarter non-GAAP earnings in the middle of our guidance range.
>
> *          *          *
>
> I'd like to share some segment specifics from our first-quarter performance. ***Comp sales in our premium fashion segment were down 6%. . . . LOFT's comp sales were down 3% on an 8% store traffic decline, and Ann Taylor comp sales were down 11% on a 13% decline in store traffic.***
>
> *          *          *
>
> While these actions will support our near-term performance, we will also continue to aggressively work on our enterprise transformation to create sustainable performance for the longer term through enhanced customer facing capabilities. ***The tough environment certainly highlights the necessity of the transformation we are executing, and we are working to ensure that Ascena emerges as a strong competitor that can simultaneously drive value to a demanding customer and produce the returns expected by our shareholders.***

541213.3

109.     During the same call, Defendant Giammatteo stated "Comp sales were down 5%, but outperformed an 8% decline in store traffic and a 2% decline in average dollar sale that resulted from increased promotional activity that was needed to offset softer than expected demand."

110.     On January 10, 2017, the Individual Defendants caused Ascena to issue a press release, in which Defendant Jaffe acknowledged that store traffic continued to depress the Company's financial results. Specifically, he stated:

> We were disappointed by our overall Holiday performance. Outside of discrete peaks during the holiday season, we experienced stronger than expected store traffic headwinds. As a result, we were forced into a more highly promotional stance in order to move through inventory in the face of softer overall consumer demand. At this juncture, we are positioning our full year outlook assuming that the trend we experienced through Holiday continues. We continue to aggressively work our Change for Growth enterprise transformation, and are focused on expense management opportunities to help us navigate the challenging environment.

111.     On February 28, 2017, the Audit Committee, including Defendants Buggeln and Rubin, and Pearce, met via telephone.  Defendants Jaffe and Giammatteo also attended the meeting.  According to the meeting minutes, the attendees were given a report highlighting the quarterly goodwill impairment update and ANN integration.  The attendees were told that ANN exceeded its book value by less than 20% and that a goodwill impairment was possible.

112.     On March 6, 2017, the Individual Defendants caused Ascena to file its quarterly report on Form 10-Q for the period ended January 28, 2017 (the "2Q17 10-Q"), reporting net income of $0.18 per diluted share.  The report was signed by Defendants Jaffe and Giammatteo. The 2Q17 10-Q reported goodwill of $1.279 billion and intangible assets of $1.27 billion.

113.     The above statements in ¶ 112 were materially misleading because they failed to disclose: (i) that declining performance by the ANN brands and other indicators signaled that the Company must perform an impairment test; and (ii) that the Company was reasonably likely to

recognize an impairment charge to accurately reflect the value of ANN's goodwill and intangible assets.

114.    With respect to the financial statements contained therein, the 2Q17 10-Q represented the following:

> These interim condensed consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") and are unaudited. In the opinion of management, however, such condensed consolidated financial statements contain all normal and recurring adjustments necessary to present fairly the condensed consolidated financial condition, results of operations, comprehensive loss and cash flows of the Company for the interim periods presented.  In addition, certain information and footnote disclosures normally included in financial statements prepared in accordance with the accounting principles generally accepted in the United States of America ("US GAAP") have been condensed or omitted from this report as permitted by the SEC's rules and regulations. However, the Company believes that the disclosures herein are adequate to ensure that the information is fairly presented.

115.    The above statements in ¶ 114 were materially misleading because they failed to disclose that the 10-Q overstated Ascena's assets and understated its expenses, thereby overstating its income.

116.    The same day, the Individual Defendants caused Ascena to issue a press release regarding the second quarter 2017 financial results. Therein, Defendant Jaffe acknowledged:

> ***Reflecting on our second quarter results, we saw a continuation of trends that have been in place for some time.*** While we remain generally pleased with selling performance during peaks, ***our base business remained soft due to ongoing store traffic headwinds and overall customer price sensitivity, which have become persistent issues impacting our larger sector.*** While our second quarter comp sales were in line with our guidance, we were forced to be much more promotional than planned to achieve this level of performance.

> . . . As I reflect on our strategic position, ***we continue to see the disruptive trend toward ecommerce transactions, and the growing influence of online engagement on traditional brick and mortar activity across our sector. We've invested heavily in our omni-channel platform over a multi-year period, and we continue to aggressively evolve our organization to embrace and serve customers in this new retailing paradigm. Yet, there is much more to do. As part of our Change for Growth transformation work, we are developing advanced analytics***

37

> *and customer experience management capabilities that will enhance our opportunities to drive revenue and margin. We continue to aggressively pursue cost structure opportunities, including refinement of our operating model and our ongoing fleet optimization work. We view these initiatives as critical enablers that will allow us to profitably serve our customers in a highly dynamic sector.*

(emphasis added).

117.    The same day, the Company held a conference call to discuss the results.  During the call, Defendant Jaffe reiterated the declining trends impacting Ascena's operations, stating in relevant part:

> *Reflecting on our second-quarter results, we saw a continuation of trends that have been a place for some time.* While we remain generally pleased with selling performance during peaks, *our base business remains soft due to ongoing store traffic headwinds and overall customer price sensitivity, which have become persistent issues impacting our larger sector.* While our second-quarter comp sales were in line with our guide, *we were forced to be much more promotional than planned to achieve this level of performance.*
>
> LOFT comp sales were down 2% on an 8% decline in store traffic. . . . Ann Taylor comp sales were down 9% on an 11% decline store traffic. Comp sales performance improved sequentially from the prior quarter, but we missed customer demand due to a lack of consistent fashion offering across the assortment, as well as limited depth in print pattern and novelty detail.

(emphasis added).

118.    On March 15 and 16, 2017, the full Board, including Defendants Bayne, Buggeln, Kirschenbaum, Krill, Pearce, Rubin, and Yaccarino met in New York, New York.  During the meeting, the Board was provided a summary report on the Audit Committee meeting on February 28, 2017.

### G.    The Truth is Revealed

119.    On May 17, 2017, Ascena announced that it would perform an impairment analysis for its goodwill and intangible assets and reduced its fiscal 2017 guidance.  In a press release, the Company stated:

David Jaffe, President and CEO, commented, "Industry-wide traffic headwinds and a highly elevated promotional environment have persisted at levels significantly above our expectations, resulting in a miss to our third quarter sales and earnings outlook. We have adjusted our second-half outlook to reflect this environment and limited near term visibility, and no longer believe it appropriate to expect a stabilization of traffic and resulting normalization of comp sales against softer demand in the year-ago period."

The Company's revised third quarter and full year fiscal 2017 sales and earnings outlook is as follows:

| Period | Comparable Sales | Non-GAAP EPS |
|---|---|---|
| Q3 FY17 | Down 8% | $0.04 - $0.06 |
| Full Year FY17 | Down 7% - Down 6% | $0.10 - $0.15 |

Jaffe continued, "The specialty retail sector is in a period of unprecedented secular change that is disruptive to traditional business models, and we believe operating conditions in our sector are likely to remain challenging for the next 12 to 24 months. . . .

120.    On this news, Ascena's stock price fell $0.76, or 26%, to close at $2.06 per share, on unusually heavy trading volume.

121.    On May 31, 2017, the Audit Committee, including Defendants Buggeln, Rubin, and Pearce, met via telephone.  Defendants Jaffe and Giammatteo also attended the meeting. According to the meeting minutes, the Committee reviewed the potential for an impairment of ANN's goodwill and was working with PricewaterhouseCoopers on the impairment assessment. At the meeting, the attendees reviewed the following slide:

541213.3



## Goodwill and Intangible Asset Impairment

- As the Company's May 17th pre-announcement indicated, during the third quarter the Company concluded that there were impairment indicators present which required the Company to test its goodwill and indefinite lived intangible assets for impairment during the third quarter of Fiscal 2017.

- The Company had been planning to early adopt ASU 2017-04 in connection with it's annual impairment assessment schedule for Q4. ASU 2017-04 simplifies the impairment test by removing Step 2 which required a hypothetical purchase price allocation. Under the new guidance, goodwill impairment is determined using a single step process by comparing the fair value of a reporting unit with its net book value (or carrying amount), including goodwill. The new guidance no longer allows the option to book a provisional impairment and then record an adjustment in a subsequent period.

- The Company is working with PwC on the impairment assessment using the brand submitted long range plans. We expect to receive a draft report from PwC around May 26th.

- The 10-Q has been updated to include the required disclosures, however it will need to be updated once we know the specific brands and intangible assets impacted, as well as the amounts.

4/115

3

Confidential Information

ASCNA1374

122.     On June 5, 2017, the Audit Committee, including Defendants Buggeln, Rubin, and Pearce met via telephone. Defendants Jaffe and Giammatteo also attended the meeting. According to the meeting minutes, based upon the impairment assessment analysis the consolidated financial statements, footnotes and MD&A sections of the 10-Q for the third quarter of fiscal 2017 were updated to reflect the goodwill and other intangible assets impairment charges at the ANN INC., Lane Bryant and Maurices reporting units. In light of the foregoing, the meeting discussed options concerning the timing of the earnings release and filing of the 10-Q, which is being targeted for Thursday, June 8, 2017.

123.    Also at the June 5, 2017 Audit Committee meeting, the attendees reviewed a draft letter from management of Ascena to Deloitte.  The letter, which as produced is almost entirely redacted, states:



June 5, 2017

Deloitte & Touche LLP
100 Kimball Drive
Parsippany, New Jersey 07054

We are providing this letter in connection with your review of the condensed consolidated balance sheet of Ascena Retail Group, Inc. and subsidiaries (the "Company" or "Ascena") as of April 29, 2017 and the related condensed consolidated statements of operations and comprehensive (loss) income for the three and nine months periods ended April 29, 2017 and April 23, 2016 and the statements of cash flows for the nine months ended April 29, 2017 and April 23, 2016 (the "condensed consolidated interim financial information") for the purpose of determining whether any material modifications should be made to (1) the condensed consolidated interim financial information for it to conform with accounting principles generally accepted in the United States of America (GAAP) or (2) to the disclosures related to changes in internal control over financial reporting that have materially affected, or are likely to materially affect, internal control over financial reporting.

124.    The Audit Committee also reviewed a document titled "Audit Committee Update With Ascena Board," dated June 6, 2017.  The document described key changes to the Company's third quarter 2017 Form 10-Q, showed changes to the document compared to a version produced on May 24, 2017, and provided an updated earnings release. In the documents produced to plaintiff, the May 24, 2017 Form 10-Q is not produced, and the comparison version in the June 6, 2017 packet is entirely redacted.

125.    On June 8, 2017, Ascena issued a press release, disclosing a $1.324 billion impairment charge to its goodwill and intangible assets.

126.    The same day, the Company held a conference call during which Defendant Giammatteo admitted that the facts underlying the Company's impairment charge existed for years.  Specifically, he stated as follows:

One such item for the third quarter was $1.3 billion noncash impairment charge related to enterprise goodwill and trade names. This charge represents a significant change in the market environment we've seen over the past couple of years. I will note that it has no impact on our operations, ability to service debt, compliance with financial covenants or underlying liquidity.

127.     Indeed, Defendant Giammatteo conceded that the goodwill write down was not an overnight phenomenon, but rather, that the downward decline in the Company's sales had been leading to an impairment charge *for years*.

128.     On June 9, 2017, the full Board, including Defendants Jaffe, Pearce, Bayne, Buggeln, Kirschenbaum, Krill, Rubin, Yaccarino, and Rauch, and non-party Muto, met in New York, New York.  During the meeting, the Board was given a summary report of the Audit Committee meetings on May 31, 2017, June 5, 2017, and June 8, 2017.

**H.     The Board Helps Jaffe Successfully Complete His Scheme to Enrich Himself**

129.     Jaffe was motivated to complete the ANN acquisition to enrich himself.  The ANN acquisition would increase Ascena's stock price and revenue base, both of which were significant factors in his incentive compensation.  When Ascena acquired ANN, Jaffe knew ANN's business to be experiencing sustained negative trends, as did Defendants Krill, Bayne, and Rauch due to their previous positions at ANN.  However, these Defendants knew that the acquisition would be very lucrative for them personally.

130.     According to Ascena's public filings, during fiscal 2016 and 2017, while Ascena's stock price was artificially inflated by his concealment of negative business information, Jaffe received $11,312,125 in total compensation from Ascena.  Of that amount, $9,292,894, or over 80%, was incentive compensation awarded due to the achievement of various metrics set by the compensation committee.  The ANN Acquisition increased Jaffe's incentive compensation by increasing the Company's stock price and its revenue base.

131.     As of May 2019, when the Board decided to terminate Jaffe, a substantial portion of this incentive compensation was unvested.  Rather than clawback compensation that Jaffe did not rightfully earn due to his wrongdoing, the Board did the opposite.  On May 1, 2019, the Board entered a Transition and Separation Agreement with Jaffe under which he would no longer serve as CEO.  In the agreement, the Company agreed to pay Jaffe his base salary of $1 million for two years.  As if this outlandish and unwarranted severance period were not enough, the Board abetted Jaffe's personal enrichment due to his wrongdoing.

132.     Had Jaffe simply been terminated or resigned, he would have lost millions of dollars in unvested stock options and restricted stock units.  Conspiring with him to ensure that Jaffe retained his ill-gotten gains, the Board agreed to keep Jaffe on as an "advisor" through June 29, 2019, during which period the Company agreed that it could only terminate him with cause.  Due to his nominally maintaining employment at Ascena for an additional two months, Jaffe achieved the "total years test" under the Company's 2016 Omnibus Incentive Plan, which resulted in the vesting of all of his outstanding and unvested stock options and restricted stock units, finally allowing him to reap the financial rewards of his wrongdoing.

## VI.    DAMAGES TO ASCENA

133.     As a direct and proximate result of the Individual Defendants' conduct, Ascena has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a)       costs incurred from restoring the value of its impaired brands and trademarks;

b)       costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws; and

c)       costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Ascena.

43

134.     In addition, Ascena's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

135.     The actions complained of herein have irreparably damaged Ascena's corporate image and goodwill.  For at least the foreseeable future, Ascena will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Ascena's ability to raise equity capital or debt on favorable terms in the future is now impaired.

VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136.     Plaintiff brings this action derivatively in the right and for the benefit of Ascena to redress injuries suffered, and to be suffered, by Ascena as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, and violations of Sections 10(b) of the Exchange Act.  Ascena is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.     Plaintiff will adequately and fairly represent the interests of Ascena in enforcing and prosecuting its rights.

138.     Plaintiff has continuously been a shareholder of Ascena at times relevant to the wrongdoing complained of and is a current Ascena shareholder.

139.     When this action was filed, Ascena's Board of Directors consisted of eleven directors, eight of whom are Defendants Bayne, Buggeln, Krill, Rubin, Yaccarino, Rauch, Teffner, and Welborn, and three of whom are non-party directors Muto, Begeman, Keglevic.

140.     Demand is excused as to the entire Board because, for the reasons that follow, a majority, nine of Ascena's eleven current directors, could not disinterestedly and independently

consider a demand for action in connection with the wrongdoing alleged herein. Eight of Ascena's current directors are defendants and Muto, who is not a defendant, is not disinterested and independent of the eight defendant directors.

### A.      Non-Party CEO Muto

141.    Muto is primarily employed as the CEO of Ascena. Muto's role as CEO of Ascena is both the most prestigious and by far the highest paid position he has held in his career. Muto previously had not served as the chief executive of a publicly traded corporation. Muto received total compensation during 2018 and 2019 of $5,948,301 and $3,199,941, respectively. Muto's professional reputation and access to significant, personally material compensation from Ascena are contingent on maintaining his position as CEO. Because the Individual Defendants comprise eight of the ten directors on the Board other than Muto, Muto is reliant on their goodwill for continued employment and he could not disinterestedly consider a demand to sue the Individual Defendants. Muto is likewise beholden to the Individual Defendants on the Board who promoted him to CEO in May 2019.

142.    Muto's fellow directors have concluded that he is not independent under Nasdaq listing guidelines, and he is not designated as an independent director in the Company's proxy statements. This decision was due in part to his receipt of significant remuneration from the Company and his need to work collaboratively and closely with the Individual Defendants on the Board and the Jaffes. Due to his responsibilities as CEO, Muto is not disinterested and independent of the other Individual Defendants and demand is futile as to him as a result.

### B.      Defendant Teffner

143.    Teffner is primarily employed as the Executive Chair of Ascena. When she was appointed, Teffner received an appointment bonus of $1,050,000. Teffner will receive a base salary of $1 million per year and is eligible for significant additional compensation. Teffner's

45

professional reputation and access to significant, personally material compensation from Ascena are contingent on maintaining her position as Executive Chair.  Because the Individual Defendants comprise seven of the ten directors on the Board other than Teffner, Teffner is reliant on their goodwill for continued employment and she could not disinterestedly consider a demand to sue the Individual Defendants.  Teffner is likewise beholden to the Individual Defendants on the Board who offered her the position of Executive Chair in May 2019.

144.    Teffner's fellow directors have concluded that she is not independent under Nasdaq listing guidelines, and since becoming an employee of Ascena, she is not designated as an independent director in the Company's proxy statements.  This decision was due in part to her receipt of significant remuneration from the Company and her need to work collaboratively and closely with the Individual Defendants on the Board and the Jaffes.  Due to her responsibilities as Executive Chair, Teffner is not disinterested and independent of the other Individual Defendants and demand is futile as to her.

### C.    Former ANN Officers and Directors

145.    Defendants Krill, Bayne, and Rauch and non-party Muto all served together for years at ANN prior to the acquisition and have longstanding professional and personal relationships.  As a result, Muto could not disinterestedly and independently consider a demand for action against Krill, Bayne, and Rauch.  Likewise, Krill, Bayne, and Rauch could not disinterestedly and independently consider a demand for action against each other.  Rauch served as a director of ANN from 2011 until the acquisition in 2015. Krill had served as ANN's CEO since 2005, and Bayne had served as a director of ANN since 2014.  As alleged above, Muto had worked at ANN since 2008.  Each of Krill, Bayne, and Rauch voted to approve Ascena's acquisition of ANN, which resulted in a windfall to Krill and Muto of approximately $30.3 million and $17.4 million, respectively, due to the acceleration of stock awards.

46

146.    Krill was ANN's CEO and knew the details of its business.  Were she presented with a demand for action in connection with the concealment of ANN's deteriorating business, she could not disinterestedly consider it because if she did, she would be acknowledging that ANN's business was deteriorating and that such information was concealed, and that she had helped conceal it.  Krill received over $30 million due to Ascena's acquisition of ANN.  She could not be expected to disinterestedly respond to a demand for action when doing so would mean that her compensation was inflated and not properly earned.  According to her director's independence questionnaire for 2018, as of August 17, 2018, Krill continued to earn significant residual income from Ascena due to her role at ANN.  As a result, demand is excused as to Krill.

147.    Bayne knew the truth about ANN's declining sales due to her previous role on the board of ANN.  ANN's entire board including Bayne, not a special committee, oversaw negotiations with Ascena and the other potential acquirers of ANN.  Further, ANN's board voted unanimously to recommend the merger.  As a result, in order to be informed in that vote, Bayne became significantly more informed regarding the details of ANN's performance and future prospects than an outside director not on the Audit Committee might otherwise be.  In order to evaluate whether ANN's prospects warranted rejection of Ascena's overtures, Bayne was required to, and did, inform herself as to ANN's same store sales results.  Bayne therefore knew that ANN's performance was suffering and that at relevant times ANN's true value was less than its carrying value.  As a result, demand is excused as to Bayne.

148.    Further, Muto and Rauch also knew the truth about ANN's declining business due to their roles at ANN prior to the merger, for substantially the same reasons as alleged directly above with respect to Krill and Bayne.  Were they to consider a demand and decide to take action against Krill and Bayne for concealing the true state of ANN's business, they would be

47

acknowledging that Ascena overpaid for ANN and that they too had concealed material information.  As a result, Muto and Rauch could not disinterestedly and independently consider a demand for action.

### D.  Audit Committee Members

149.  Demand is excused as to Defendants Buggeln and Rubin, who were a majority of the Audit Committee during the wrongdoing alleged herein.  As alleged in detail above, Buggeln and Rubin received at least quarterly updates from management regarding Ascena's operations and results.  They reviewed detailed information regarding the Company's core business, including the ANN business and ANN's carrying value. Due to their quarterly reviews and the information provided by management, Buggeln and Rubin knew that ANN's in store sales were not in line with the previously issued 2017 guidance, and that ANN's carrying value was overstated.  Buggeln and Rubin nonetheless approved the Company's issuance of the Form 10-Q's and Form 10-K's for Ascena's 2016 fiscal year and the first three quarters of Ascena's 2017 fiscal year.  Buggeln's and Rubin's decision to approve issuance of those financial statements knowing that they substantial overstated ANN's carrying value and concealed the deterioration of its business, was not a valid exercise of business judgment.  Demand is therefore excused as to Buggeln and Rubin in connection with their decision to permit the Company to issue misleading financial statements.

150.  Buggeln and Rubin similarly could not disinterestedly consider a demand for action against defendant Jaffe.  In particular, Jaffe's misleading public statements conveyed the same misleading picture as the disclosures approved by the Audit Committee.  Buggeln and Rubin therefore could not disinterestedly and independently consider a demand for action against Jaffe because taking action against Jaffe would demonstrate that they too had concealed and misrepresented material information.

E.      **Bayne, Buggeln, Krill, Rubin, and Yaccarino**

151.    Demand is excused as to Bayne, Buggeln, Krill, Rubin, and Yaccarino because they permitted pervasive misrepresentations regarding the results and carrying value of the ANN brand, which was Ascena's core business.  The facts support an inference that Bayne, Buggeln, Krill, Rubin, and Yaccarino were aware of grave problems with Ascena's core business and allowed Ascena to conceal those problems and to affirmatively misrepresent the carrying value of ANN.

152.    According the Company's 2016 Form 10-K, the ANN brands accounted for approximately 33% of the Company's total net sales.  The next closest brand was Lane Bryant, which accounted for 16% of Ascena's total net sales.  Bayne, Buggeln, Krill, Rubin, and Yaccarino had access to and had actual knowledge of all material information related to ANN.

153.    According to the 2016 Form 10-K, Ascena's total assets were approximately $5.5 billion.  The impairment charge totaled over $1.3 billion, nearly 25% of Ascena's total assets.  The material discrepancy between the true value of Ascena's assets and the value disclosed by Ascena prior to the impairment charge warrants an inference that the Individual Defendants did not believe the value they ascribed to the Company's goodwill and other intangible assets in its public disclosures.

154.    Further supporting that inference, on October 4, 2016, at the time Yaccarino joined the Board, Ascena announced its "Change for Growth" program, to "refine [the Company's] operating model to increase its focus on key customer segments, improve its time-to-market, reduce working capital, and enhance its ability to serve its customer on any purchasing platform, all while better leveraging the Company's powerful shared services platform."  The Individual Defendants simultaneously caused the Company to reorganize its businesses, creating a separate "Premium Fashion" segment consisting solely to the ANN brands.  As Defendant Jaffe explained on October 4, 2016: "We will continue to work aggressively on customer-facing capability and

541213.3

operating efficiencies to drive benefits on both the margin and cost side of our financials, and we believe there is additional opportunity beyond what we have highlighted today as we continue our transformation work with Accenture[, an outside advisor retained by the Individual Defendants.]" The reorganization further supports the inference that to Bayne, Buggeln, Krill, Rubin, and Yaccarino knew of the problems with ANN's business and knew that the publicly disclosed carrying value was not accurate.

155.   Indeed, Bayne, Buggeln, Krill, Rubin, and Yaccarino knew that Ascena had been experiencing a "challenging retail environment" for quite some time.  The Company's stock price had been declining, and the Company had forecasted earnings reductions long prior to the May 2017 announcement that the Company would conduct an impairment analysis.

156.   Due to the foregoing, Bayne, Buggeln, Krill, Rubin, and Yaccarino face a significant likelihood of liability because they knew  undisclosed facts rendering Ascena's public disclosures false.

**F.   Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino**

157.   Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino approved the Transition and Separation Agreement with Jaffe in May 2019.  As detailed above, the agreement paid unconscionable excess severance compensation to Jaffe for two years following his termination.  Worse, the agreement effectively manipulated the Company's existing, shareholder approved, incentive compensation plan, specifically to allow Jaffe to obtain the vesting of all of the awarded but unvested incentive compensation he had obtained through his issuance of misleading statements about the Company's core business and the success of the ANN acquisition.  The circumvention of existing vesting requirements to confer an unjustified windfall on Jaffe could not have been a valid exercise of business judgment and demand is excused as a result

### G.     The Entire Board is Not Independent of Jaffe

158.     The entire current Board is beholden to Defendant Jaffe for their positions on the Board.  As set forth herein, Defendant Jaffe's family founded Ascena and he dominated the Board, effectively making all operation and strategic decisions from approximately 2002 through the ANN acquisition.  Each of the directors on the Board was nominated to the Board due to Jaffe's approval and support.  As a result, no member of the current Board could disinterestedly consider a demand against Jaffe for the misleading statements herein.

## VIII.  CLAIMS

## <u>COUNT I</u>

**Against Defendants Jaffe, Giammatteo, Bayne, Buggeln, Krill, Rubin, Yaccarino, Elliot Jaffe, Pearce, and Kirshenbaum for Breach of Fiduciary Duty**

159.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ascena's business and affairs, particularly with respect to issues as fundamental as public disclosures.

161.     Defendants Jaffe, Giammatteo, Bayne, Buggeln, Krill, Rubin, Yaccarino, Elliot Jaffe, Pearce, and Kirshenbaum's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Jaffe, Giammatteo, Bayne, Buggeln, Krill, Rubin, Yaccarino, Elliot Jaffe, Pearce, and Kirshenbaum intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ascena.

162.     In breach of their fiduciary duties owed to Ascena, Defendants Jaffe, Giammatteo, Bayne, Buggeln, Krill, Rubin, Yaccarino, Elliot Jaffe, Pearce, and Kirshenbaum willfully

participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

163.    In particular, Defendants Jaffe, Giammatteo, Bayne, Buggeln, Krill, Rubin, Yaccarino, Elliot Jaffe, Pearce, and Kirshenbaum knowingly or in bad faith made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Ascena's assets, ANN's business results and value, and the Company's goodwill and intangible assets.

164.    As a direct and proximate result of Defendants Jaffe, Giammatteo, Bayne, Buggeln, Krill, Rubin, Yaccarino, Elliot Jaffe, Pearce, and Kirshenbaum's breaches of their fiduciary obligations, Ascena has sustained and continues to sustain significant damages,  including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.   As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT II

**Against Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino for Breach of Fiduciary Duty**

165.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.    Each of Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ascena's business and affairs, including with respect to the use of Ascena's equity and/or funds to compensate management.

167.    Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino's decision allow Jaffe's equity awards to continue to vest following his resignation as

CEO was an intentional or bad faith breach of the fiduciary duties they owed to the Company. Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino intentionally or in bad faith breached or disregarded their fiduciary duties to protect the rights and interests of Ascena.

168.    In breach of their fiduciary duties owed to Ascena, Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

169.    In particular, Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino knowingly or in bad faith aided Jaffe's scheme to personally enrich himself through his pervasive misrepresentations regarding Ascen's business, and by offering Jaffe a specious advisory position circumvented the clear terms of a stockholder approved compensation plan under which Jaffe was not entitled to the full vesting of his awards.

170.    As a direct and proximate result of Defendants Bayne, Buggeln, Krill, Rauch, Rubin, Teffner, Welborn, and Yaccarino's breaches of their fiduciary obligations, Ascena has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company

### COUNT III

**Against Krill for Unjust Enrichment**

171.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

172.    By her wrongful acts and omissions, Defendant Krill was unjustly enriched at the expense of and to the detriment of Ascena.  When Ascena acquired ANN, Krill received

approximately $30 million in compensation due to the transaction while she was concealing material negative information regarding ANN's performance.

173.    Plaintiff, as a stockholder and representative of Ascena, seeks restitution from Krill, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by this Defendant from her wrongful conduct and fiduciary breaches.

174.    Plaintiff, on behalf of Ascena, has no adequate remedy at law.

## COUNT IV

### Against Jaffe for Unjust Enrichment

175.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

176.    By his wrongful acts and omissions, Defendant Jaffe was unjustly enriched at the expense of and to the detriment of Ascena.  Due to his wrongdoing, Jaffe obtained millions of dollars in incentive compensation to which he was not entitled, due while he was concealing material negative information regarding ANN's performance.

177.    Plaintiff, as a stockholder and representative of Ascena, seeks restitution from Jaffe, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by this Defendant from his wrongful conduct and fiduciary breaches.

178.    Plaintiff, on behalf of Ascena, has no adequate remedy at law

## COUNT V

### Against Jaffe and Giammatteo for Contribution
### For Violations of Sections 10(b) and 21D of the Exchange Act

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

54

180.    Defendants Jaffe and Giammatteo are named as Defendants in a related securities class action pending in the U.S. District Court for the District of New Jersey, *In re Ascena Retail Group, Inc. Securities Litigation*, C.A. No. 2:19-cv-13529-KM-JBC (D.N.J.).  The conduct of these Defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

181.    Ascena is named as a defendant in a related securities class action that allege and assert claims arising under §10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Ascena is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

182.    As officers, directors and otherwise, Defendants Jaffe and Giammatteo had the power or ability to, and did, control or influence, either directly or indirectly, Ascena's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act and SEC Rule 10b-5.

183.    Defendants Jaffe and Giammatteo are liable under §21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

184.     Defendants Jaffe and Giammatteo have damaged the Company and are liable to the Company for contribution.

185.     No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Ascena, demands judgment as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Ascena and that Plaintiff is an adequate representative of the Company;

B.     Against all of Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.     Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Ascena;

D.     Directing Ascena to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ascena and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     a proposal to strengthen the Company's controls over financial reporting;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.     a proposal to strengthen Ascena's oversight of its disclosure procedures;

4.     a provision to control insider transactions; and

56

5.      a provision to permit the stockholders of Ascena to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Ascena has an effective remedy;

F.      Awarding to Ascena restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: June 19, 2020                     Respectfully submitted,

Of Counsel:                                          FARNAN LLP

GLANCY PRONGAY & MURRAY LLP          /s/ Michael J. Farnan
Benjamin I. Sachs-Michaels                Brian E. Farnan (Bar No. 4089)
712 Fifth Avenue                                   Michael J. Farnan (Bar No. 5165)
New York, New York 10019                  919 North Market Street
Telephone: (212) 935-7400                  12th Floor
Facsimile: (212) 756-3630                   Wilmington, DE  19801
Email: mhouston@glancylaw.com         (302) 777-0300 (Telephone)
Email: bsachsmichaels@glancylaw.com  (302) 777-0301 (Facsimile)
                                                             bfarnan@farnanlaw.com
Robert V. Prongay                               mfarnan@farnanlaw.com
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067

Telephone: (310) 201-9150                *Attorneys for Plaintiff*
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
        prajesh@glancylaw.com

541213.3